J-S34033-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: R.C., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.C., MOTHER | : : : : : : : | |
| | : | No. 833 MDA 2025 |

Appeal from the Decree Entered May 22, 2025
In the Court of Common Pleas Lackawanna County Orphans' Court
at No(s): A-22, Year 2025

BEFORE:  STABILE, J., SULLIVAN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:      **FILED: NOVEMBER 20, 2025**

M.C. (Mother) appeals from the decree which granted the petition filed by the Lackawanna Office of Youth and Family Services (the Agency) and terminated Mother's parental rights to R.C. (Child).  We affirm.

CASE HISTORY

Child was born in March 2023.  Within days, she was placed in the emergency protective custody of the Agency.  The orphans' court explained:

> At the hospital[,] Mother tested positive for methamphetamine. It was also reported that Mother was homeless.  Mother found out that she was pregnant upon arrival at the hospital.  [Child] was placed in her current foster home on March 23, 2023.  The Shelter Care hearing was held on that same date.  Mother did not attend the Shelter Care Hearing.  Child was adjudicated dependent on April 6, 2023.  Mother also did not attend the adjudication hearing. The Agency was unable to identify [Child's] Father from the onset of the case.  On April 1, 2025, the Agency filed a Petition to Terminate Parental Rights against Mother and Unknown Father. The hearing on the petition was held on April 21, 2025.

Orphans' Court Opinion (OCO), 7/9/25, at 1 (citations omitted).

At the termination hearing, the Agency presented testimony from the caseworker, Nicole Landon, and Child's foster mother, D.V. (Foster Mother). Mother testified in opposition to termination and the guardian *ad litem* advocated on behalf of Child.[1]

*Ms. Landon*

The caseworker, Ms. Landon, testified that the Agency received a referral regarding Mother's drug use and homelessness prior to Child's birth. N.T., 4/21/25, at 55. Ms. Landon explained that after Child was born, and "for the first six months of this case, until September 29th of 2023, [Mother's] whereabouts were unknown." *Id.* In October 2023, Ms. Landon learned that Mother was incarcerated. *Id.* at 56. She stated:

> I went to the jail in October. It was my first meeting with [Mother]. [I] had a conversation with her. I did ask her why she didn't reach out to the Agency or come in person [before being incarcerated]. [Mother] told me that she tried reaching out to the previous caseworker but wasn't getting a response, [and] she was in active addiction and was trying to work on welfare benefits and things of that nature.

*Id.* at 57-58.

---

[1] The orphans' court found there was no conflict with the guardian *ad litem* representing Child's best and legal interests. N.T., 4/21/25, at 8; OCO at 12 (orphans' court stating its "specific finding based on the facts and circumstances … that no conflict exists"); *see also In re Adoption of K.M.G.*, 240 A.3d 1218, 1224 (Pa. 2020) (stating that counsel may represent both interests "so long as the child's legal interests do not conflict with the attorney's view of the child's best interests").

Ms. Landon testified Mother remained incarcerated until November 7, 2023, when Mother was discharged to an inpatient rehabilitation program called "Beyond Addiction," where Mother remained until February 2024. *Id.* at 58. Ms. Landon observed that "until recently, it's been very hard to get in touch with [Mother]." *Id.* She stated that throughout the case, Mother's "goals and objectives have remained the same." *Id.* Mother's family service plans included "drug and alcohol [treatment], mental health [treatment], understanding her nurturing role as a caregiver, obtaining housing, employment, and meeting the basic needs of [C]hild." *Id.* at 62. Ms. Landon recounted regular permanency review hearings held on May 29, 2023, August 21, 2023, November 14, 2023, April 9, 2024, August 6, 2024, and December 3, 2024. *Id.* at 58-66, 95. According to Ms. Landon, Mother demonstrated little or no progress at the hearings. *Id.*

With regard to Child, Ms. Landon testified that "throughout the first year of [Child's] life[,] there were no visits due to the fact that [Mother's] whereabouts were unknown and then she was incarcerated and at Beyond Addiction." *Id.* at 72-73. However, Mother began attending weekly, one-hour visits with Child in March 2024, although Mother "missed a lot of visits" and "was late to almost every visit" she attended. *Id.* at 73. Ms. Landon stated that it was "not until more recently where [Mother has] been on time and seems more engaged and interactive in the visits." *Id.* at 73-74. Nonetheless, the Agency continued to have "on-going concerns" about Mother's addiction and housing issues. *Id.* at 78. Ms. Landon opined that

Mother remained unable to provide Child with a safe, stable and secure home. *Id.* at 103. She stated, "I don't think [Child] would be harmed" by termination of Mother's parental rights. *Id.* at 76. In contrast, Ms. Landon believed Child "would be negatively affected if she was removed from the home of Foster Mother and her fiancé." *Id.* at 102. Ms. Landon described Child as "very attached" to Foster Mother, her fiancé, and the couple's other foster child, "J." *Id.* at 96.

*Foster Mother*

Foster Mother testified that Child was one week old when she and her fiancé "picked [Child] up from the hospital." *Id.* at 41-42. Within days of Child's arrival, Foster Mother and her fiancé began fostering another infant, J., who was born three months before Child.[2] *Id.* At the time of the hearing, Child and J. were two years old. Foster Mother described them as "completely attached to each other." *Id.* She explained:

> They act like twins. They are very, very close. They look for each other when they get hurt, when they're scared, when they're happy. They share a bedroom. They talk to each other at night when the monitor is on. We hear them talking to each other. They sing together. This morning, when I went to get [Child] for the hearing, [Child] woke up [J.] because she didn't want to go downstairs without [her].

*Id.* at 43.

---

[2] Foster Mother testified that J.'s parents' rights had been terminated, and she and her fiancé were in the process of adopting J. *Id.* at 43.

As to Mother, Foster Mother testified that she began taking Child to one-hour weekly visits with Mother in 2024, when Child was a year old. She relayed that Mother "was not always present for the visits, and often she was late for the visits." *Id.* at 11-12. Foster Mother stated that Child was initially hesitant because she was not familiar with Mother, but Child became more familiar with Mother over time. *Id.* at 18. Also, Mother's visits were more consistent in the month prior to the termination hearing. *Id.* at 26. Foster Mother noted that Mother's 7-year-old son attended two of the visits.[3] *Id.* at 37.

Foster Mother confirmed that she and her fiancé are a pre-adoptive resource for Child, and "would welcome" Child in their home permanently. *Id.* at 34. In response to questioning by Mother's counsel, Foster Mother said that she had not made a "definitive decision" regarding continued visits with Child and Mother in the event of adoption. *Id.* at 38. She stated that she and her fiancé "would decide what is best for [Child] at that point." *Id.*

*Mother*

Mother testified that she was residing in a "sober house," and participating in programs to address her drug use and mental health issues. *Id.* at 116, 119. Mother had also started two part-time jobs. *Id.* at 120-21. Mother stated that she had been sober for "almost six months." *Id.* at 133.

---

[3] In addition to Child, Mother has two minor sons. *Id.* at 125-26, 137. Mother does not have custody of either son, but was exercising supervised visits with the youngest son when she included him in two visits with Child. *Id.* at 123, 137.

She agreed that she had not fully complied with her family service plan, but said that recovery "does take time," and "a little more time than what [she] expected." *Id.* at 134. Mother testified:

> I have been trying my hardest … to do everything that the [c]ourts have recommended, but I also don't feel that I was given the right time frame. The whole point in my eyes is reunification, is to get [Child] back in [my] care if I'm doing [well]. I don't feel that [the Agency] has helped me out with any of that. Any of it. I felt like it's either Diversion Court helped me or I had to do it on my own. I do believe [Child] is in good hands now with [Foster Mother] and her family. They're doing something I can't do. But at the same time I don't feel that I was given as much help as I should have been [given] with [Child].

*Id.* at 135.

*Guardian ad litem*

The guardian *ad litem* expressed his support for termination. He stated:

> I think it's clear that based on all the evidence proffered that Mother is currently not in a position to provide proper parental control and care for [C]hild. And this state has existed since [Child's] birth. [Child] went to her [foster placement] straight from the hospital, and that's her family now. I believe it is clearly in her best interest to remain there.

*Id.* at 159-60. The guardian *ad litem* acknowledged "the strides [Mother] has made," but stated his belief that "the Agency has met their burden" and "it's in [Child's] best interests that she be free for adoption." *Id.* at 163.

At the conclusion of the hearing, the orphans' court announced that it was going to grant the Agency's request to terminate Mother's parental rights. *Id.* at 173. By order and decree dated April 21, 2025, and entered May 22, 2025, the orphans' court terminated Mother's parental rights. On June 5,

2025, Mother filed a timely notice of appeal and concise statement of errors pursuant to 1925(a)(2)(i). Mother presents the following question for review:

> A. Whether the [orphans'] court erred as a matter of law and/or manifestly abused its discretion in determining the Agency sustained its burden of proving the termination of Mother's parental rights is warranted under Sections 2511(a)(2), 2511(a)(5) and/or 2511(a)(8) of the Adoption Act?

> B. Even if this Court concludes the Agency established statutory grounds for the termination of Mother's parental rights, whether the [orphans'] court nevertheless erred as a matter of law and/or manifestly abused its discretion in determining the Agency sustained its additional burden of proving the termination of Mother's parental rights is in the best interests of Child?

Mother's Brief at 5.

## DISCUSSION

Our appellate review is limited to whether the termination of Mother's parental rights is supported by the evidence. *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). We must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *Id.* When the factual findings are supported, we may not disturb the decision unless the orphans' court erred or abused its discretion. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). We may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* (citations omitted). This Court will not re-weigh evidence, and we may not reverse a decision "merely because the record could support a different result." *In re Adoption of K.M.G.*, 219 A.3d 662, 670 (Pa. Super. 2019) (*en banc*).

When considering a request to terminate parental rights, the orphans' court must first determine whether there are grounds for termination under 23 Pa.C.S. § 2511(a). The evidence must be clear and convincing. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). If the court finds grounds for termination under Section 2511(a), it must then consider the child's needs and welfare under Section 2511(b). This Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we consider the orphans' court's finding of grounds for termination under Section 2511(a)(5).

*Section 2511(a)(5) Grounds for Termination*

Section 2511(a)(5) provides that a parent's rights may be terminated when:

> The child has been removed from the care of the parent by the court … for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(5).

Mother argues that the Agency "failed to demonstrate by clear and convincing evidence [that Mother] is unable to remedy the conditions which necessitated the removal of Child." Mother's Brief at 13. According to Mother:

> Despite various setbacks, including incarceration and two (2) successful in-patient rehabilitation stays, she has maintained her sobriety, is living in a sober home (where she is obligated to pay rent) and working two (2) jobs. Mother has maintained her mental health … and has provided clean urine screens…. Mother is fully engaged in her recovery, attending daily AA meetings and group meetings … four (4) days a week.

*Id.* at 11-12.

In response, the Agency stresses that Mother was required to make diligent efforts towards the assumption of full parental responsibilities, and "progress that does not result in [her] ability to assume the role of parent and provide for the day to day needs of [C]hild does not extinguish a court's ability to terminate on this ground." Agency's Brief at 16. We agree that the orphans' court properly exercised its discretion in finding grounds for termination under Section 2511(a)(5).

> At the conclusion of the hearing, the orphans' court stated:

> Everyone agrees as we sit here today[, M]other is still not in a position to bring [C]hild home. So based on the testimony presented[,] the [c]ourt finds that … [C]hild has been in care for a period of [over] six months, the conditions for removal or placement continue, [Mother] will not remedy the conditions within a reasonable period of time, and termination will best serve the needs of [C]hild.

N.T. at 170-71. The court observed that Mother's addiction and housing issues "have been present in Mother's life for more than a decade," and while Mother has "made some progress most recently," the evidence demonstrated that Mother "made little progress towards alleviating the circumstances that led to [Child's] placement." OCO at 15. The court also found that termination would

best serve Child's needs and welfare. *Id.* at 16. As the record supports the court's findings, we discern no error or abuse of discretion in the termination of Mother's parental rights under Section 2511(a)(5).

*Section 2511(b) Needs and Welfare*

Section 2511(b) requires that the orphans' court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). Intangibles "such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The court must consider a parent-child bond and effect of permanently severing a bond. *Id.* However, the court "must also consider whether the child[ is] in a pre-adoptive home and whether [the child has] a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268.

Mother admits that Child is bonded to her foster parents, but argues that "there was no exploration of the consequences of severing any bond," with Mother and her other children, "including her brother" who visited Child. Mother's Brief at 14. Thus, Mother submits that the orphans' court erred by concluding that termination serves Child's needs and welfare. *Id.* at 15.

The Agency counters that Mother's argument regarding the bond analysis, including the bond with Mother's other children, "is misplaced, as the only testimony of record was that [the younger son] participated in 1 or 2 visits [with Child]." Agency's Brief at 20-21. The Agency argues that the record "contains more than sufficient testimony [to] demonstrate that

although Mother and Child's interactions may have improved," Mother's "lack of progress resulting in her absence" from Child's life, "coupled with the clear bond between Child and Foster Mother," supports the finding that termination serves Child's needs and welfare. *Id.* at 21. We agree. The orphans' court explained:

> [T]he testimony presented establishes that while [Child] has begun to recognize Mother, especially in the last few weeks, this court is not persuaded that the recognition by [C]hild of Mother[] as someone [C]hild is familiar with[,] establishes the existence of a parent-child bond. In fact, this court finds [Child] would not suffer detrimental harm if the parent-child relationship were severed. The testimony credibly established [C]hild is thriving in her foster home and is extremely bonded to both foster parents, as well as a foster sibling.

OCO at 16.

The record supports the orphans' court's reasoning. As such, the court did not err or abuse its discretion in finding that termination served Child's needs and welfare under Section 2511(b).

Decree affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary


Date: 11/20/2025

- 11 -